UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>ALUN JAMES GUERUE,<br>Defendant. | 3:21-CR-30096-RAL<br><br>REPORT AND<br>RECOMMENDATION FOR<br>DISPOSITION OF MOTION<br>TO SUPPRESS |

In this prohibited firearm possession case, Alun James Guerue (Guerue) seeks to suppress evidence obtained as a result of an unlawfully extended traffic stop of the vehicle he was behind the wheel of, and questions an officer asked about the presence of weapons and drugs in the vehicle. Guerue also seeks to prevent the government from using the statements he made to a special agent the day after under the exclusionary rule. Because the evidence and statements emanated from permissible officer inquiries that did not unreasonably prolong the mission and duration of the stop, Guerue's suppression motion should be denied.

BACKGROUND

Around 6:30 p.m. on February 26, 2021, Gerald Dillon (Dillon), a patrol sergeant and K-9 handler for the Rosebud Sioux Tribe (RST), observed a vehicle travelling 81 mph in a 65-mph zone on SD Highway 18, west of Soldier Creek Community. As Dillon

1

turned around, the driver pulled off the highway onto an approach. Dillon activated his emergency lights but the driver kept going, proceeding to an adjoining residential driveway where the vehicle eventually stopped. At some point, at or before the stop, Dillon noticed the front passenger bend down. Although the vehicle had tinted windows, it was sunset, Dillon had his headlights on, and he could see the passenger hunched over.

Dillon got out of his truck and walked up to the driver's side of the stopped vehicle. When queried about the reason for the stop, the driver admitted it was "[p]robably because I was speeding."[1] Dillon requested to see a driver's license and registration for the vehicle but the driver said he did not have a license or any ID on him. The driver did provide his name – Guerue – and date of birth but did not know where the vehicle registration was. Dillon asked who lived in the adjacent home and Guerue responded that it was his aunt's house. After identifying the passenger, S.O. (a 17-year-old juvenile and Guerue's brother), Dillon continued:

| | |
|---|---|
| Officer Dillon: | Okay, you don't carry any weapons inside the vehicle or anything? |
| Guerue: | I do actually. |
| Officer Dillon: | You do, what do you got with you? |
| Guerue: | A, or no, no, no it's my G19 I have with me. |

---

[1] Suppr. Hr'g Ex. 1 at 18:39:22-18:39:27 (Sept. 8, 2022).

| | |
|---|---|
| Officer Dillon: | Okay where's that at? |
| Guerue: | It's under his [S.O.'s] seat. |
| Officer Dillon: | It's under his seat? |
| Guerue: | Yeah. |
| Officer Dillon: | Okay, [S.O.] I'm just going to have you step on out okay, just for safety reasons, I'm going to grab that [(the gun)] and you'll get it back when we leave okay. |
| Guerue: | Yeah, for sure.[2] |

Dillon located a Glock 19 pistol, seized it, and took the gun back with him to his truck. There, at 6:43 p.m. (about three minutes into the stop), he called in to dispatch to request warrant and license checks on Guerue and S.O. and to run the firearm's serial number in the national database.

Approximately two minutes later, Dillon returned, informed Guerue that the license plates on the vehicle had expired seven months earlier, and directed Guerue to step out of the vehicle and stand behind it. After a brief discourse about the name of Guerue's aunt and why he pulled into her driveway, Dillon patted Guerue down, but found nothing on him. Dillon then asked Guerue, "Anything in the vehicle I need to know about?" "Any marijuana?" "Cocaine, nothing like that?" "No

---

[2] Suppr. Hr'g Ex. 1 at 18:41:03-18:41:25.

methamphetamine?"[3] all to which Guerue responded in the negative. Guerue though would not give Dillon consent to search the vehicle.

Dillon instructed Guerue to stand in front of Dillon's truck. Dillon stepped behind the driver's side door of the truck and radioed for another officer to assist him. He explained to Guerue the reason for the delay (Dillon was still waiting for the information from dispatch) and then posed a hypothetical question to Guerue: "If I run my dog around the car, is he going to alert to anything?" Guerue responded "No."[4]

RST Officer Samuel Antoine arrived contemporaneously and spoke with Dillon. Dillon advised his colleague that he planned to deploy his K-9, Santos, and did so at 6:52 p.m. Santos promptly alerted to the presence of illegal drugs as he sniffed the seam to the driver's door of the vehicle. Dillon handcuffed and placed Guerue in a rear seat of the truck. At 6:53:19 p.m., roughly 10 minutes after Dillon's records check call in, dispatch radioed back with the requested information, reporting that Guerue and S.O. had no warrants, Guerue's driver's license was suspended, and no record could be found on the Glock.

Based on Santos's alert, Dillon and Antoine searched the vehicle and found 602 grams of marijuana, 27 grams of cocaine, $672 in cash, a large grinder, ammunition, an

---

[3] *Id.* at 18:46:11-18:46:30.

[4] *Id.* at 18:51:15-18:51:19.

iPhone, and mail addressed to Guerue. Dillon notified Guerue and S.O.'s mother of the arrests and told her that the vehicle parked in the driveway would be towed and subject to an evidence hold. Dillon and Antoine subsequently transported both brothers to separate detention facilities (adult and juvenile ones) where the two were held on tribal drug charges.

Shortly before 2:00 p.m. the next day (February 27, 2021), Rosebud Special Agent Joshua Antman interviewed Guerue at the tribal jail.[5] During the interview, and after being *Mirandized*, Guerue made incriminating statements about the gun and drugs in the vehicle.[6]

Eight months later, a federal grand jury indicted Guerue and charged him with being a prohibited person in possession of a firearm. Afterward, he moved to suppress the evidence seized following the vehicle stop and the statements he gave to Antman during the jail interview.[7] The government opposed the motion.[8]

---

[5] Docket Nos. 28 at 3; 29 at 3.

[6] Docket Nos. 28 at 3; 29 at 3-4.

[7] Docket Nos. 27, 28.

[8] Docket No. 29.

## DISCUSSION

### A. Expansion of the Stop

#### 1. Weapons Inquiry

Guerue first claims that Dillon did not have the requisite reasonable suspicion to expand the traffic stop beyond the issuance of a speeding ticket.[9] He posits that Dillon's questions about weapons, taking of the Glock, and request for an information check on the gun were improper and unnecessarily prolonged the stop. As a consequence, Guerue says, the evidence found in the vehicle became the fruit of an unconstitutional search and seizure and should be suppressed.[10] But Dillon's weapons inquiry related to the stop's mission and did not unreasonably extend the course of the stop.

A vehicle stop for a traffic violation is a seizure for constitutional purposes and justifies a police investigation into the violation.[11] A routine traffic stop is more like a *Terry*[12] stop than a formal arrest.[13] Like a stop under *Terry*, "the tolerable duration of

---

[9] Docket No. 28 at 3-5.

[10] *Id.*

[11] *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

[12] *Terry v. Ohio*, 392 U.S. 1 (1968).

[13] *Rodriguez*, 575 U.S. at 354.

police inquiries in the traffic stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop *and attend to related safety concerns*."[14]

The "mission" of a traffic stop includes (1) addressing the traffic violation (and in the process deciding whether to issue a ticket for the violation); (2) conducting "ordinary inquiries incident to the stop"; and (3) taking "certain negligibly burdensome precautions" to ensure officer safety.[15] Authority for the seizure ends when these tasks are – or reasonably should have been – completed.[16]

Because traffic stops are "especially fraught with danger to police officers,"[17] an officer may need to take certain precautions to complete his mission safely.[18] The Fourth Amendment categorically permits an officer to order the driver[19] and all passengers[20] out of the vehicle during a stop for officer safety. The officer may take these precautions because his safety "stems from the mission of the stop itself."[21]

---

[14] *Id.* (emphasis added).

[15] *Id.* at 355-56.

[16] *Id.* at 354.

[17] *Id.* at 356.

[18] *Id.*

[19] *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).

[20] *Maryland v. Wilson*, 519 U.S. 408, 411 (1997).

[21] *Rodriguez*, 575 U.S. at 356.

The Fourth Amendment also "tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention."[22] That is, the detention or seizure remains lawful despite unrelated on-the-scene inquiries so long as they do not measurably extend the length of the stop.[23]

With these precepts in mind, the Court now must examine whether Dillon's questions about weapons were part of the mission of the stop and, if not, whether they measurably extended the stop's duration.

### a. Mission

Dillon's single question about Guerue carrying any weapons inside the vehicle related to officer safety and therefore to the mission of the traffic stop.[24] Dillon was

---

[22] *Id.* at 354; *see also Arizona v. Johnson*, 555 U.S. 323, 327-38 (2009) (questioning); *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005) (dog sniff).

[23] *Johnson*, 555 U.S. at 333; *see also Rodriguez*, 575 U.S. at 355 ("An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.").

[24] *Rodriguez*, 575 U.S. 355-56; *see also Johnson*, 555 U.S. at 327 (finding stop, which included officer asking if there were any weapons in vehicle, was legitimate); *United States v. Yang*, 39 F.4th 893, 902-03 (7th Cir. 2022) (officer's question about whether there were any weapons in truck was "proper because it concerned officer safety"); *United States v. Racer*, No. 2:20-CR-00095, 2021 WL 1342536, at *2 (S.D.W. Va. Apr. 9, 2021) (officer's single question, whether defendant was carrying any firearms, was "perhaps the most basic of inquiries related to officer safety, . . . it was related to the mission of the stop itself[,] and d[id] not violate the Fourth Amendment"), *aff'd*, No. 21-4642, 2022 WL 2526999 (4th Cir. July 7, 2022); *United States v. McReynolds*, No. CR-18-01170-001-PHX-GMS, 2019 WL 2869669, at *3 (D. Ariz. July 3, 2019) (during traffic stop, officers may take such steps as are reasonably necessary to protect their personal safety and to maintain status quo during course of stop including questioning vehicle's occupants about any weapons that

8

outnumbered and needed to know if Guerue or S.O. had any dangerous weapons in the vehicle.[25] Several factors aroused Dillon's suspicions early on: (1) Guerue's perceived evasive maneuver turning off the highway onto an approach;[26] (2) his decision to drive on and ultimately to stop and park in someone else's driveway;[27] (3) S.O.'s bending down in his seat after Guerue had stopped or was in the process of doing so;[28] and (4) Guerue and S.O. not having a driver's license, any identification, or a vehicle registration.[29] Dillon's suspicions heightened when Guerue said he had his unholstered "G19" loose under S.O.'s seat.[30]

---

may be in car), *aff'd*, Nos. 20-10115, 20-10125, 2021 WL 5492984 (9th Cir. Nov. 23, 2021); *State v. Wright*, 386 Wis.2d 495, 508-09, 926 N.W.2d 157, 164 (2019) (officer's question about presence of weapons in car directly related to officer safety and was part of traffic stop's mission).

[25] *See United States v. Buzzard*, 1 F.4th 198, 203-04 (4th Cir.) (officer outnumbered and needed to know more about what occupants had in car), *cert. denied*, 142 S.Ct. 728 (2021).

[26] Suppr. Hr'g Tr. 12-13 (Sept. 8, 2022).

[27] *Id.*

[28] *Id.* at 13-14; Mot. Hr'g Tr. 16-18 (Oct. 3, 2022).

[29] Suppr. Hr'g Tr. 15-16, 18, 21.

[30] Suppr. Hr'g Ex. 1 at 18:41:16-18:41:45; *see United States v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021) (trooper's question about weapons or drugs in vehicle came only after his suspicions were raised by conduct and statements of vehicle occupants); *see also United States v. Hill*, 852 F.3d 377, 380-84 (4th Cir. 2017) (affirming denial of suppression motion where officer asked occupants three times whether there were any firearms in car; following third inquiry, one occupant responded he had a firearm at which point officer shouted "gun").

But even in the absence of reasonable suspicion, courts have held the mission of the traffic stop encompasses an officer's right to inquire about the presence of weapons in the vehicle.[31] As one court has reasoned, "If a police officer may, in the interest of officer safety, order all occupants out of the vehicle for the duration of the stop without violating the Fourth Amendment, [then] the officer may take a less burdensome precaution to [secure his] safety."[32]

Given the circumstances, Dillon's questions about the gun, and his seizure of it, were within the mission of the stop and appropriate responses to the safety hazards he faced.

b. Reasonable Detention

Yet even assuming Dillon's weapons questions were unrelated to the mission of the traffic stop, the questions did not violate the Fourth Amendment by unduly lengthening the stop. Unlike the dog sniff that unreasonably elongates the mission-

---

[31] *See, e.g., United States v. Arrington*, No. 3:19-CR-00108-RGJ, 2019 WL 5789852, at *3 (W.D. Ky. Nov. 6, 2019) ("the first part of [the officer's] question, about weapons [in the car], was directly related to officer safety, and thus 'does not bespeak a lack of diligence'"); *McReynolds*, 2019 WL 2869669, at *1, 3 (it was reasonable for officer to ask vehicle's occupants if they had any weapons); *People v. Campbell*, 329 Mich. App. 185, 199, 942 N.W.2d 51, 60 (2019) ("a police officer is free to question a lawfully detained person about the presence of weapons in his or her vehicle because such an inquiry relates to the officer's ability to conduct the traffic stop in a safe manner"); *see also Racer*, 2021 WL 1342536, at *2 (citing cases in which courts have recognized the authority of "officers conducting a traffic stop [to] inquire about dangerous weapons").

[32] *Wright*, 386 Wis. 2d at 508, 926 N.W.2d at 163.

10

related activities of a traffic stop,[33] the two questions Dillon asked about the gun amounted to such a *de minimis* extension of time they can hardly be measured. These questions did not unlawfully prolong the stop.[34]

Nor did the seizure of the Glock or request to have dispatch run warrant, license, and gun registration checks stretch the stop beyond constitutional bounds.[35] Although

---

[33] *See and compare Rodriguez*, 575 U.S. at 352 (dog sniff prolonged stop beyond time reasonably required to complete mission of stop) *with Caballes*, 543 U.S. at 407-08 (dog sniff added no time to traffic stop because it was conducted simultaneously with mission-related activities); *see also Wright* 386 Wis. 2d at 512-13, 926 N.W.2d at 165-66 (explaining key facts that lead to different conclusions in *Rodriguez* and *Cabelles*).

[34] *See Buzzard*, 1 F.4th at 204 (officer's question "didn't extend the stop even a second" and "passe[d] constitutional muster under *Rodriguez* even if it exceeded the scope of the stop's mission"); *McReynolds*, 2019 WL 2869669, at *3 ("[officer's] question – whether the men had weapons – did not unreasonably prolong the traffic stop"); *Arrington*, 2019 WL 5789852, at *3 ("Because the questions related to officer safety and only delayed the stop a few seconds, the officer's questions did not convert the encounter into an unlawful seizure."); *United States v. Herrera*, No. 17-CR-10112-ADB, 2018 WL 1020112, at *3 (D. Mass. Feb. 22, 2018) ("asking [d]efendant whether he had any weapons . . . , which took at most a minute or two, did not meaningfully extend the length of the stop and was otherwise reasonable under the circumstances known to the officer"); *see also Hill*, 852 F.3d at 380, 384 (officer's inquiry, three times, whether there were firearms in the car "did not cause the stop to be prolonged").

[35] *See McReynolds*, 2019 WL 2869669, at *1, 3-4.

the checks took 10 minutes to complete,[36] Santos had alerted, to the odor of drugs in the vehicle, by then.[37]

### 2. Drugs Inquiry

Much of what was just said about Dillon's weapons query applies with equal force to his questions about whether there were drugs (marijuana, cocaine, and methamphetamine) in the vehicle. The questions took less than ten seconds to ask[38] and did not lengthen the stop in any meaningful way.[39] And they were based on suspicions

---

[36] *Hill*, 852 F.3d at 380, 382-83 (20-minute stop, with 8 minutes to search DMV, NCIC, and PISTOL databases, acceptable); *McReynolds*, 2019 WL 2869669, at *1 (stop of just under 20 minutes, in which records checks conducted on occupants of speeding car and gun removed from it, permissible).

[37] *Caballes*, 543 U.S. at 406, 408 (while one officer was in process of writing warning ticket, another officer walked his K-9 around car; no extension of stop beyond time reasonably necessary to complete stop's mission); *Hill*, 852 F.3d at 384 (use of K-9 at scene was "contemporaneous" with officers' diligent pursuit of stop's mission).

[38] Suppr. Hr'g Ex. 1 at 18:46:20-18:46:29.

[39] *Buzzard*, 1 F.4th at 204 (officer's question to driver – if there was anything illegal in car – did not unlawfully prolong stop especially since he had not received information needed to perform checks on driver of vehicle yet); *Hill*, 852 F.3d at 380, 384 (20-minute stop where vehicle occupants asked – 3 times – if there were any drugs or firearms in car did not impermissibly expand scope of stop or time needed to pursue stop's mission); *McReynolds*, 2019 WL 2869669, at * 1, 3 (officer's questions about weapons and drugs did not unreasonably lengthen less than 20-minute stop); *Arrington*, 2019 WL 5789852, at *1-3 (officer's query, whether driver had any "drugs, weapons, [or] dead bodies in the car," only delayed stop a "few seconds" and "did not measurably extend the otherwise proper stop"); *State v. Brown*, 392 Wis. 2d 454, 460, 472, 495, 945 N.W.2d 584, 587, 593-94 (2020) (question if there was anything on driver's person officer "needed to know about" or "be concerned about" (asked to see if driver "had any illegal weapons or drugs"), did not

garnered from (1) Guerue's unusual and circuitous manner of pulling over;[40] (2) S.O.'s furtive movement as the vehicle stopped;[41] (3) no one having a driver's license or any identification;[42] (4) a lapsed vehicle registration and expired license plates;[43] (5) an aunt whose first name Guerue could not remember;[44] and (6) the presence of Guerue's "G19" under the front passenger seat.[45] These suspicions exceeded those Dillon needed to inquire about drugs.[46]

---

"measurably extend the duration of the stop" because it was posed "concurrently with mission-related activities").

[40] Suppr. Hr'g Tr. 12-13.

[41] Mot. Hr'g Tr. 16-18.

[42] Suppr. Hr'g Tr. 15-16.

[43] *Id.* at 18, 21.

[44] Suppr. Hr'g Ex. 1 at 18:45:31-18:45:46.

[45] *Id.* at 18:41:03-18:41:16; Suppr. Hr'g Tr. 17.

[46] *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (officer had requisite reasonable suspicion to ask if there was anything illegal in car when car pulled into unknown driveway after a few blocks; it was nighttime, driver was nervous, and occupants told conflicting stories about travel plans); *United States v. Davis*, 943 F.3d 1129, 1133 (8th Cir. 2019) (finding reasonable suspicion of drug trafficking and that drug related questions did not unlawfully extend traffic stop where driver nervous, neither driver nor passenger was on rental agreement, and loaded pistol in vehicle); *see also Hill*, 852 F.3d at 384 (officer did not conduct traffic stop in slow or inefficient manner to expand criminal investigation beyond temporal confines of stop without reasonable suspicion of criminal activity).

*Peralez*,[47] Guerue relies on, is distinguishable. The officer in *Peralez*, without anything to suggest criminal activity was afoot, repeatedly asked drug interdiction questions that more than doubled the time the defendant was detained.[48] By contrast, Dillon's drug questions were neither recast nor of any appreciable duration and he had the reasonable suspicion to justify asking them.

### B. The Interview

Guerue likewise claims the statements he made, the day after the stop and while in custody, should be suppressed as the fruit of Dillon's illegally drawn-out traffic stop and the search and seizure conducted during the stop.[49] But because Dillon's questions (about weapons and drugs)[50] did not impermissibly expand the stop or offend the Fourth Amendment, there is no poisonous tree from which tainted fruit might sprout. So, Guerue's statements are fully admissible.[51]

---

[47] *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008).

[48] *Id.* at 1117-18, 1121.

[49] Docket No. 28 at 5.

[50] Suppr. Hr'g Ex. 1 at 18:41:03-18:41:25, 18:46:11-18:46:30.

[51] *See United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017) ("The exclusionary rule applies to statements that result from a Fourth Amendment violation . . ." when "police obtain the statement 'by exploitation of that illegality . . . .'") (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88).

## CONCLUSION

Since Dillon's weapons inquiry at the beginning of the stop was permissible for officer safety reasons, any extra time dispatch took to run the serial number of the seized gun (with the warrants and driver's license checks), did not measurably extend – for Fourth Amendment purposes – the traffic stop. And Dillon had the reasonable suspicion he needed to ask, and did not invalidate the stop with, his questions to Guerue about whether there were any drugs in the vehicle. In the end, none of the evidence obtained during the stop, or the statements Guerue made the ensuing day, should be suppressed.

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Guerue's Motion to Suppress Evidence[52] be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[53] Unless an extension of time for cause is later obtained,[54] failure to

---

[52] *See* Docket No. 27.

[53] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[54] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

file timely objections will result in the waiver of the right to appeal questions of fact.[55]

Objections must "identify[] those issues on which further review is desired[.]"[56]

    Dated this 24th day of October, 2022, at Pierre, South Dakota.

                              **BY THE COURT:**

                              */s/ Mark A. Moreno*

                              **MARK A. MORENO**
                              **UNITED STATES MAGISTRATE JUDGE**

---

[55] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[56] *Arn*, 474 U.S. at 155.