UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALUN JAMES GUERUE,<br><br>Defendant. | 3:21-CR-30096-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION TO SUPPRESS |

Around dusk in late February 2021, Alun James Guerue was pulled over by a police officer for speeding.  Guerue had violated various traffic laws that night: he was driving over the speed limit with a suspended driver's license in a car with expired plates.  The police officer testified that these fairly routine offenses typically end with a warning or citation, but this traffic stop ended quite differently, and the pending motion to suppress challenges whether the officer unnecessarily prolonged the stop.  Guerue has since been indicted on one count of being a prohibited person in possession of a firearm in violation of federal law.  Because the officer did not appear to unreasonably prolong the traffic stop without sufficient cause to do so, the motion to suppress is denied.

I.      **Facts Relevant to Motion to Suppress**

On the evening of February 26, 2021, Officer Gerald Dillon was on patrol in an unmarked police truck as a Rosebud Sioux Tribe Law Enforcement Services (RSTLES) officer. T1 at 8.[1] Dillon at the time was a sergeant of police and a canine handler with a drug dog in his police truck. Id. At around 6:30 p.m., shortly before dusk, Dillion was headed eastbound on South Dakota Highway 18 near Soldier Creek, South Dakota, when he observed a red vehicle traveling west that appeared to be speeding. T1 at 9–10. The driver of the red vehicle was Defendant Alun James Guerue, and he was accompanied by a juvenile who was seated in the passenger seat. Dillon activated his radar and clocked Guerue driving 81 miles-per-hour in the 65 miles-per-hour zone. T1 at 10; Ex. A.

Dillon turned his truck around so he could stop Guerue for speeding. T1 at 8, 11–13. When Dillion turned his truck around to initiate the traffic stop, Guerue immediately turned left off the highway onto a gravel road and into the driveway of a house located near the highway. T1 at 12; see also Ex. 4 (satellite image of gravel approach and driveway); Ex. A (indicating Guerue turned off at an approach when Dillon turned around). Guerue slowed his car to a stop roughly ten to fifteen seconds after turning off the highway and onto the gravel driveway. T2 at 17–18. Dillon testified that when he stops someone they usually will pull over to the side of the road, T1 at 13, but that he could not remember if he actually activated his emergency lights as he turned his truck around or as Guerue's car turned off the highway, T2 at 18. Rosebud police were unable to recover dash cam video showing the time when Dillon first observed Guerue speeding to when the body camera video begins, though Dillon's testimony was that his dash cam was on and should have been operational. T2 at 8–10, 25–27. Dillon felt as if Guerue was trying to evade or avoid the

---

[1] Two separate suppression hearings were held before Magistrate Judge Mark Moreno: the first on September 8, 2022, and the second on October 3, 2022. Testimony from the first and second suppression hearings will be cited as "T1" and "T2" respectively.

stop by turning off the highway. T2 at 18; see Ex. 2 at 4. Dillon testified, however, that Guerue stopped in a prompt manner and that he had "no suspicion that the vehicle wasn't going to stop." T2 at 19–20.

As Guerue slowed his car to a stop in the driveway, Dillon observed what he considered "furtive movements in the front passenger seat area." T1 at 13. Dillon testified that he saw the person in the passenger seat bend, move side-to-side, and turn around. T1 at 13–14. Dillon suspected that the passenger was hiding or concealing something. T1 at 14; T2 at 17. Because of the tint on the Guerue car's windows, Dillon did not have a clear view of the passenger's movement; he did not see the passenger put anything under the seat or cover anything up. T2 at 22.

The rest of the stop was captured on video by Officer Dillon's body camera. Ex. 1 (video); Ex. 2 (transcript of video). At approximately 6:39:22 p.m.,[2] Dillon approached Guerue's vehicle on the driver's side. Dillon asked Guerue, "Do you know why I'm stopping you?" Guerue replied, "Probably because I was speeding." Ex. 1 at 18:39:20–25; Ex. 2 at 1. Dillon responded that he clocked Guerue driving 81 miles-per-hour and asked whether Guerue had his driver's license and registration. Ex. 2 at 1. Guerue admitted that he did not have a driver's license and began searching the glove box for the registration. Dillon asked where Guerue and the juvenile were headed, and Guerue said they were headed home to Parmalee.[3] Ex. 2 at 1. When asked, Guerue provided his name and birthdate and told Dillon the car was in his and his ex-girlfriend's name.

---

[2] This Court has reviewed the video, and for the most part the transcript accurately reflects what transpired once Dillon and Guerue had come to a complete stop in the driveway, although it does not capture occasional crosstalk on the police radio.

[3] Parmalee is a community on the Rosebud Indian Reservation northwest of where this stop occurred. Guerue's car had been travelling westbound on Highway 18 toward Parmalee, but the turn onto the gravel road and into a driveway was not the route to Parmalee.

Ex. 2 at 1–2.  The juvenile likewise provided his name when asked to do so.  Ex. 2 at 2.  This exchange occurred while Guerue unsuccessfully attempted to locate his registration.

About one minute into the stop, Dillon asked Guerue who lived in the house at the end of the driveway, and Guerue responded that it was his aunt's house.  Ex. 1 at 18:40:45; Ex. 2 at 2. Dillon then asked the juvenile his age and whether he had a license to drive, and the juvenile responded that he did not. Ex. 2 at 2.  Guerue told Dillon that he could bring someone over or call someone to come get him.  Ex. 2 at 2.  Guerue presumably meant, and Dillon understood him to mean, that he could call someone with a valid driver's license to come pick him and the juvenile up to take them home.  T1 at 40.  While the conversation was occurring, Guerue continued to search for his registration.

After this initial dialogue, around one minute and 41 seconds into the stop, Dillon asked Guerue whether there were any weapons inside the vehicle:

| Officer Dillon: | Okay, you don't carry any weapons inside the vehicle or anything? |
|---|---|
| **Guerue:** | I do actually. |
| **Officer Dillon:** | You do, what do you got with you? |
| **Guerue:** | A, or no, no, no it's my G19 I have with me. |
| **Officer Dillon:** | Okay where's that at? |
| **Guerue:** | It's under his [the juvenile's] seat. |
| **Officer Dillon:** | It's under his seat? |
| **Guerue:** | Yeah. |

Ex. 1 at 18:41:03–16; Ex. 2 at 2–3.  Officer Dillon asked the juvenile to step out of the car "for safety reasons" and told them that he was going to grab the gun but they would get it back when they left. Ex. 2 at 3.  Guerue replied, "Yeah for sure."  After the juvenile exited the vehicle, Dillon

asked Guerue, "Do you got it in a holster or anything?" Guerue responded, "No, it's just loose." Ex. 2 at 3. Dillon moved one of the grocery bags on the floor of the passenger side—Guerue said they had just been at the store—and retrieved a Glock 19 pistol from under the seat. Ex. 1 at 18:31:37–55. At this point, Guerue located his registration but noted that it was expired. Ex. 2 at 3. Officer Dillon, just before going back to his truck, told the juvenile he could return to his seat in the car and asked the two of them to hang tight. Ex. 2 at 3. It was 6:42:00 p.m. when Dillon walked back to his police truck—just over two minutes since he first walked up to Guerue's car window. Dillon took the gun with him back to his truck.

Back at his vehicle, Dillon set the gun aside and radioed dispatch at 6:43:23 p.m. to run a driver's license and warrant check on both Guerue and the juvenile. Ex. 2 at 3; T1 at 18. About twenty-five seconds later, Dillon radioed dispatch, "Also 10-16 on a firearm when you're ready." Ex. 1 at 18:43:48; Ex. 2 at 3. Another fifteen seconds or so later, Dillon read dispatch the serial number off the gun. Ex. 2 at 3.

At the first suppression hearing, the Government asked Officer Dillon why he asked whether there were weapons in the vehicle during his initial dialogue with Guerue. T1 at 16. Dillon explained that when he deals with the public he typically asks if there are weapons in the vehicle. He further testified that "the movement that was observed" and "the behavior of the vehicle when the traffic stop was initiated" made him "just kind of . . . think what's really going on inside the vehicle." T1 at 16. Dillon testified his concern was "officer safety, mainly." T1 at 16. On cross-examination, Dillon acknowledged having no reason to think that there was anything illegal about Guerue having a gun with him when Guerue first told him about it. T1 at 39. When asked whether Dillon had any evidence or information at the time that the gun was stolen or otherwise an illegal firearm, Dillon responded that he did not. T1 at 39. According to Officer

Dillon's testimony, the "10-16" check he ran with dispatch is "basically an NCIC check to see if the firearm has been entered as stolen or not." T1 at 18.[4] Dillon testified that it is standard practice for him to run a records check on a firearm every time he discovers a gun in a vehicle during a traffic stop. T1 at 18. There is nothing in the record about how much additional time it takes RSTLE dispatch to run an NCIC check on a firearm alongside standard warrant and license checks on a vehicle's occupants.

At around 6:45:00 p.m., Officer Dillon exited his truck and reapproached Guerue's vehicle. Dillon walked up to Guerue's rear license plate and rubbed off some dust to reveal the registration tag. The tag was expired. Back at the driver's side window, Dillon reengaged in conversation with Guerue, had Guerue step out of the car, patted Guerue down, and asked Guerue if he could search the vehicle. The verbal exchange was the following:

| | |
|---|---|
| **Officer Dillon:** | Plates expired back in July man. |
| **Guerue:** | Yeah, sorry about that. |
| **Officer Dillon:** | Okay, have you go ahead and hop on out okay. |
| **Guerue:** | Okay. |
| **Officer Dillon:** | Just have you stand behind your vehicle there. |
| **Guerue:** | Where at? |
| **Officer Dillon:** | Behind your vehicle. Who's your aunt that lives here? |
| **Guerue:** | Uh, Siers, I forgot her, it's starts with an "M" I don't |

---

[4] The record contains no detailed information about an "NCIC" check. According to the U.S. Department of Justice website, the "National Crime Information Center" is "a criminal records database allowing criminal justice agencies to enter or search for information about stolen property, missing or wanted persons, and domestic violence protection orders; to get criminal histories; and to access the National Sex Offender Registry." Dep't Just., National Crime Information Systems, https://www.justice.gov/tribal/national-crime-information-systems (last visited Dec. 20, 2022).

|                    | call her anything but she's my aunt. |
|--------------------|--------------------------------------|
| **Officer Dillon:** | Okay. |
| **Guerue:** | Like I said, I just pulled in here because I don't have a thing so and I shouldn't be. |
| **Officer Dillon:** | Oh, you pulled in here so you wouldn't get pulled over? |
| **Guerue:** | No so I wouldn't get, I guess so like because I don't have a. |
| **Officer Dillon:** | Maybe I would have kept going. |
| **Guerue:** | Else you know so. |
| **Officer Dillon:** | Okay. |
| **Guerue:** | If I do get you know thrown in, then it could stay here or something because, like I said. |
| **Officer Dillon:** | Okay, you don't have any more weapons on you do you? |
| **Guerue:** | No. |
| **Officer Dillon:** | If you want to go ahead put your hands up here, I'm just going to pat you down okay? Anything in the vehicle I need to know about? |
| **Guerue:** | No. |
| **Officer Dillon:** | Any marijuana? |
| **Guerue:** | No. |
| **Officer Dillon:** | Cocaine, nothing like that? |
| **Guerue:** | No, no. |
| **Officer Dillon:** | No, methamphetamine? |
| **Guerue:** | Shit no. |

7

| | |
|---|---|
| **Officer Dillon:** | No, alright would you consent to a vehicle search today? |
| **Guerue**: | Nah. |

Ex. 1 at 18:45:20–18:46:40. Dillon testified that Guerue's explanation about why he pulled into his aunt's driveway—"[i]f I do get thrown in, then [the car] could stay here"—raised concerns because Guerue would not be placed in jail simply for driving without a license. T1 at 22–23.

Officer Dillon testified at the suppression hearing that he did not smell any drugs in Guerue's car or on Guerue's person. T1 at 41–42. Dillon had no police intelligence that the car or Guerue had any involvement in drug trafficking. T1 at 42. Dillon routinely asked questions about weapons and drugs when he pulled someone over. T1 at 42–43. After all, Dillon was a canine handler and an officer assigned to the drug task force, so Dillon's "primary purpose on the road" was detecting drugs. T1 at 42. When asked why he told Guerue to step out of the vehicle, Dillon testified, "If there's more than one occupant in the vehicle and I want to have a conversation with the driver, I always request them to step out of the vehicle, just to get them away from the other occupants." T1 at 21.

At this point, now roughly seven minutes into the traffic stop, Officer Dillon returned to his truck and radioed dispatch to request that another officer be sent to the scene. Ex. 2 at 5. When Dillon did so, dispatch had not yet responded to the request for the license, warrant, or NCIC checks. Around 6:47:55 p.m., Dillon called over to Guerue, who was still standing behind his car and said, "Still waiting on your information man, that's what's taking so long." Ex. 1 at 18:47:55; Ex. 2 at 5. Dillon then stood at the door to his police vehicle for approximately three minutes without further conversation with Guerue. Ex. 1 at 18:48:00 to 18:51:15 p.m.

Dillon testified that at this point in the stop, he had already "determined to utilize [his] K-9 and deploy him on the vehicle." T1 at 24. Dillon testified that he was waiting for the second

8

officer to arrive before conducting the dog sniff because he would "typically have another officer with [him] as a cover officer . . . to watch the individual" and because other dogs were outside the house roaming around. T1 at 24.

The second police officer arrived on the scene at approximately 6:51:25 p.m. In short order, Officer Dillon removed his dog from the truck and walked him over to Guerue's vehicle. At the driver's side door, the dog alerted that he had "detected the odor of an illegal substance coming from within the vehicle." T1 at 25. At 6:53:14 p.m., after returning his dog to the truck, Dillon put Guerue in wrist restraints, put him in the back of the truck, and told him he would have to put up with the police dog barking at him from the other side of the divider in the backseat. Guerue was fully cooperative. Around 6:53:34 p.m., just as Guerue was placed in the back of the truck, dispatch radioed Dillon and advised that neither Guerue nor the juvenile had any outstanding warrants, that Guerue's license was suspended, and that there was no record on the gun. Ex. 2 at 6.

A subsequent search of Guerue's vehicle uncovered evidence that Guerue seeks to suppress. Guerue and the juvenile were placed under arrest and subsequently transferred to tribal detention facilities. Around 2:00 p.m. the next day, a RSTLES special agent interviewed Guerue at the jail. Doc. 28 at 3; Doc. 29 at 3–4. There was no evidence regarding that interview introduced at either suppression hearing. In briefing, the Government asserts that Guerue was read his Miranda rights before he made several incriminating statements related to the evidence found in his vehicle the night before.

Guerue's statements to the special agent, along with the evidence recovered from his car the night before, led to Guerue being indicted by a federal grand jury for being a prohibited person in possession of a firearm. Doc. 1. Guerue moved to suppress the evidence seized from his car

and his subsequent statements on the grounds that they were obtained in violation of his Fourth Amendment rights. Doc. 27. The Government resisted the motion. Doc. 29. Magistrate Judge Mark A. Moreno issued a report and recommendation to recommend denial of Guerue's motion to suppress. Doc. 52. Guerue timely filed objections to the report and recommendation. Doc. 53.

## I.    Standard of Review

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, "[i]n the absence of an objection, the district court is not required 'to give any more consideration to the magistrate's report than the court considers appropriate.'" United States v. Murrillo-Figueroa, 862 F. Supp. 2d 863, 866 (N.D. Iowa 2012) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)). This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,] . . . receive further evidence[,] or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636.

District courts have a constitutional duty to make their own factual findings when there are proper objections to a magistrate judge's report and recommendation. See Branch v. Martin, 886 F.2d 1043, 1045–46 (8th Cir. 1989) ("When objections are made to the magistrate's factual findings based on conflicting testimony or evidence, both § 636(b)(1) and Article III of the United States Constitution require de novo review.") (citation omitted); Taylor v. Farrier, 910 F.2d 518, 521 (8th Cir. 1990) ("[O]nce a party makes a proper objection to a magistrate's finding, including a credibility finding, the district court *must* make a de novo determination of that finding."). This

Court "must consider the actual testimony" and "make[] its own determinations of disputed issues"
Branch, 886 F.2d at 1046.

## II.    Discussion

The Fourth Amendment protects "the right of the people to be secure . . . against
unreasonable searches and seizures." U.S. Const. amend. IV.  As the Supreme Court of the United
States has long recognized, "No right is held more sacred, or is more carefully guarded, by the
common law, than the right of every individual to the possession and control of his own person,
free from all restraint or interference of others, unless by clear and unquestionable authority of
law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250,
251 (1891)) (cleaned up).  This right not only protects people in the comfort of their own home
but also "belongs as much to the citizen on the streets of our cities as to the homeowner closeted
in his study to dispose of his secret affairs." Id. at 8–9.  While the Fourth Amendment itself may
not provide a constitutional remedy for violations of its commands, evidence obtained through an
illegal search and seizure is generally inadmissible against the accused in a criminal prosecution.
See United States v. Leon, 468 U.S. 897, 906 (1984) (stating the exclusionary rule is "a judicially
created remedy designed to safeguard Fourth Amendment rights generally through its deterrent
effect, rather than a personal constitutional right of the party aggrieved") (cleaned up and citation
omitted); United States v. Calandra, 414 U.S. 338, 354 (1974) ("In the usual context of a criminal
trial, the defendant is entitled to the suppression of, not only the evidence obtained through an
unlawful search and seizure, but also any derivative use of that evidence.").

Not all searches and seizures conducted by police are forbidden by the Fourth
Amendment—its protections extend only to *unreasonable* searches and seizures: "Reasonableness
is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed

by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the importance of the governmental interests alleged to justify the intrusion."

Cnty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546 (2017) (cleaned up and citations omitted).

A warrantless search or seizure however is not per se unreasonable; the Fourth

Amendment's protections depend heavily on the surrounding circumstances. "In some

circumstances, such as when faced with special law enforcement needs, diminished expectations

of privacy, minimal intrusions, or the like, the [Supreme] Court has found that certain general, or

individual, circumstances may render a warrantless search or seizure reasonable." Maryland v.

King, 569 U.S. 435, 447 (2013) (cleaned up and citation omitted)); see also Terry, 392 U.S. at 20

(noting that some police conduct cannot, as a practical matter, be subject to the warrant

requirement). Traffic stops for traffic violations are one such example of where the circumstances

generally excuse police from the warrant process. United States v. Hollins, 685 F.3d 703, 705 (8th

Cir. 2012) (noting that a routine traffic stop is a "seizure" under the Fourth Amendment and must

be conducted reasonably); United States v. Lewis, 864 F.3d 937, 945 (8th Cir. 2017).

Traffic stops are viewed as the same sort of brief warrantless detention that the Supreme

Court recognized in Terry v. Ohio.[5] Arizona v. Johnson, 555 U.S. 323, 330 (2009) (citing 392

U.S. 1). Under Terry and its progeny, police need probable cause, or at the very least, reasonable

suspicion, to pull a car over for a routine traffic stop. United States v. Gordon, 741 F.3d 872, 876

(8th Cir. 2013). Police officers have probable cause to pull a car over if they have an objective

---

[5] Law enforcement's authority to pull a car over and briefly detain the driver is prescribed by a
line of cases "cumulatively portray[ing] Terry [v. Ohio's] application in a traffic-stop setting."
Johnson, 555 U.S. at 331 (compiling cases); see also Berkemer v. McCarty, 468 U.S. 420, 440
n.29 (1984) (noting "most traffic stops resemble, in duration and atmosphere, the kind of brief
detention authorized in Terry."). Terry recognized "the narrow authority of police officers who
suspect criminal activity to make limited intrusions on an individual's personal security based on
less than probable cause." Michigan v. Summers, 452 U.S. 692, 698 (1981).

and reasonable belief that a driver has broken a traffic law.  Id.  The less-rigorous standard of reasonable suspicion "exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'"  Id. (quoting United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012)).

A Court must be "mindful of the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other on the street."  Terry, 392 U.S. at 12.  However, without due regard for the Fourth Amendment, "the assurance against unreasonable . . . searches and seizures would be 'a form of words', valueless and undeserving of mention in a perpetual charter of inestimable human liberties."  Mapp v. Ohio, 367 U.S. 643, 655 (1961).  After all, "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949) (overruled on other grounds).

The constitutional bar police must clear to lawfully pull a car over is quite low; as this Court has noted previously, the Fourth Amendment requires that police officers be reasonable, not perfect.  United States v. Farlee, 427 F. Supp. 3d 1123, 1126 (D.S.D. 2019); see also Hollins, 685 F.3d at 706 ("Mistakes of law or fact, if objectively reasonable, may still justify a valid stop.").  After all, the Fourth Amendment permits police to initiate a traffic stop on a mere reasonable suspicion that the driver has committed a traffic violation "[b]ecause the 'balance between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Brignoni–Ponce, 422 U.S. 873, 878 (1975)).  Officer Dillon clearly had a legally sufficient justification for pulling Guerue's car over; he had probable cause—a reading of Guerue's car traveling 81 miles-per-hour in a 65 miles-per-hour zone.

13

While police are granted wide latitude to initiate a traffic stop, the permissible scope of their ensuing investigation is narrow and depends heavily on what occurs as the traffic stop unfolds. In Rodriguez v. United States, 575 U.S. 348, the Supreme Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." In other words, a "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Police cannot abuse the reasonable suspicion standard turning routine traffic stops into wholesale investigations of ordinary criminal wrongdoing. See Rodriguez, 575 U.S. at 355; Wilson v. Lamp, 901 F.3d 981, 986 (8th Cir. 2018) ("The search must be strictly tied to and justified by the circumstances which rendered its initiation permissible") (cleaned up and citation omitted); City of Indianapolis v. Edmond, 531 U.S. 32, 41 (2000) (noting Court has never approved checkpoint programs to detect ordinary criminal wrongdoing). Put simply, "[w]hether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." United States v. Magallon, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting Rodriguez, 575 U.S. at 354, 357).

When a driver is pulled over for committing a traffic violation and nothing more, the officer's mission is twofold; the officer may "address the traffic violation that warranted the stop" and "attend to related safety concerns." Rodriguez, 575 U.S. at 354. To address the traffic violation that warranted the stop, an officer obviously must at some point decide whether to issue a ticket or a warning for that offense. Id. at 355. Police may make other traffic-related inquires, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. An

officer may also ask a vehicle's occupants about their "destination, route, and purpose." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (citation omitted). These additional inquiries are permissible because they "serve the same objective as enforcement of the *traffic* code" and "ensur[e] that vehicles on the road are operated safely and responsibly."[6] Rodriguez, 575 U.S. at 355 (citing Delaware v. Prouse, 440 U.S. 648, 638–59 (1979)) (emphasis added); see also Illinois v. Caballes, 543 U.S. 405, 408 (2005); United States v. Murillo-Salgado, 854 F.3d 407, 415 (8th Cir. 2017) ("[A]n officer may detain the occupants of a vehicle during a traffic stop while the officer completes a number of routine but somewhat time-consuming tasks *related to the traffic violation.* . . ." (emphasis added) (cleaned up and citation omitted). Moreover, "[i]f an officer encounters legitimate complications in completing these routine tasks, the officer may reasonably detain a driver for a longer duration than when no such complications arise." Murillo-Salgado, 854 F.3d at 415 (cleaned up and citation omitted).

Here, Officer Dillon appropriately asked questions about Guerue's destination, driver's license and registration, and why he turned into a driveway. Likewise Dillon was justified calling dispatch for a check on warrants and determining that the vehicle's registration had lapsed. Rodriguez, 575 U.S. at 355. Dillon early on in the stop was aware of Guerue's commission of three different traffic violations—speeding, no driver's license, and outdated registration. Nothing prohibited Dillon from prolonging the traffic stop as he awaited the dispatch response on whether Guerue or his passenger had a warrant out for their arrest, determined whether a traffic ticket or

---

[6] This is an especially worthy endeavor, considering the exceptional danger unsafe drivers pose on our nation's roads and highways. See Emily Badger & Alicia Parlapiano, *The Exceptionally American Problem of Rising Roadway Deaths*, N.Y. Times (Nov. 27, 2022), https://www.nytimes.com/2022/11/27/upshot/road-deaths-pedestrians-cyclists.html?smid=nytcore-ios-share&referringSource=articleShare (noting United States' exceptionally high rate of road deaths compared to other industrialized countries).

warning would issue, and resolved whether a licensed driver was available to drive the car. <u>See</u> <u>generally</u> <u>United States v. Ovando-Garzo</u>, 752 F.3d 1161, 1164 (8th Cir. 2014) (concluding that when none of the occupants of a vehicle were licensed to drive, the officer was permitted "to engage in a community caretaking function of safely moving the vehicle and its occupants from the side of the road").

Police are granted leeway to attend to certain safety concerns while conducting traffic stops; after all, the Supreme Court has recognized that "traffic stops are 'especially fraught with danger to police officers.'" <u>Johnson</u>, 555 U.S. at 330 (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1047 (1983)).[7] The Court has explained that "the risk of harm to both the police and the occupants of a stopped vehicle is minimized . . . if the officers routinely exercise unquestioned command of the situation." <u>Id.</u> (cleaned up) (quoting <u>Maryland v. Wilson</u>, 519 U.S. 408, 414 (1997)). Thus, police may, in the interest of officer safety and consistent with the Fourth Amendment, order the driver and all passengers to get out of a vehicle during a routine traffic stop. <u>See</u> <u>Pennsylvania v.</u> <u>Mimms</u>, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); <u>Maryland v.</u> <u>Wilson</u>, 519 U.S. at 415 (extending <u>Mimms</u> to vehicle passengers). For the same officer safety

---

[7] Traffic stops can be quite dangerous for police officers—over the past decade, roughly one police officer per week has died in a motor-vehicle related accident in the United States. Ctrs. for Disease Control and Prevention, *Law Enforcement Officer Motor Vehicle Safety*, https://www.cdc.gov/niosh/topics/leo/default.html (last accessed Nov. 28, 2022). Others have suggested, however, that the danger to police officers during traffic stops has been somewhat overstated, and that the unrealistic perception of danger during these stops can escalate otherwise avoidable violence. <u>See, e.g.</u>, Jordan Blair Woods, <u>Policing, Danger Narratives, and Routine</u> <u>Traffic Stops</u>, 117 Mich. L. Rev. 635 (2019); David D. Kirkpatrick, Steve Eder, Kim Barker and Julie Tate, *Why Many Police Traffic Stops Turn Deadly*, N.Y. Times (Nov. 30, 2021) (excluding accidents, "an officer's chances of being killed at any vehicle stop are less than 1 in 3.6 million . . .").

reasons, police may also ask a driver whether there are any weapons in the vehicle and promptly remove the weapon from the car for the duration of the stop. See generally Rodriguez, 575 U.S. at 356 ("[A]n officer may need to take certain negligibly burdensome precautions in order to complete his mission safely."); United States v. Everett, 601 F.3d 484, 495 (6th Cir. 2010) (holding officer may ask whether driver has a gun); State v. Wright, 386 Wis. 2d 495, 508 (2019) ("If a police officer may, in the interest of officer safety, order all occupants out of the vehicle for the duration of the stop without violating the Fourth Amendment, the officer may take a less burdensome precaution to ensure officer safety."); Mimms, 434 U.S. at 333 (holding officer safety interest outweighed "mere inconvenience" of driver having to step out of car). But see Johnson, 555 U.S. at 327 ("*To justify a patdown* of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police *must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous*." (emphasis added)).

Dillon did not unreasonably prolong the traffic stop by asking whether there was a weapon in the vehicle or by removing the Glock 19 handgun from the area under the passenger seat. Everett, 601 F.3d at 495. Guerue and the Government debate whether Dillon prolonged the stop unnecessarily by seeking an NCIC check on the gun alongside calling in to seek a check of possible warrants on Guerue and his juvenile passenger. There is nothing in the record to suggest that Officer Dillon was not diligent when he ran the records check on the gun; after all, the time it took Dillon to run the check was negligible.[8] Guerue cites no case holding that such an NCIC check

---

[8] Evidence from the suppression hearings does not reveal how much longer it took dispatch to run the records check on the gun in addition to the warrant and license checks on Guerue and his passenger. While the total time it took to run the records check on the gun may not have significantly prolonged the stop, a *de minimis* violation of the Fourth Amendment can still be

unduly prolongs a traffic stop and precedent permits "certain unrelated check but not in a way that prolongs the stop.'" United States v. Salkil, 10 F.4th 897, 898 (8th Cir. 2021) (quoting Rodriguez, 575 U.S. at 355) (cleaned up).  There is no evidence that the request for an NCIC check on the handgun unreasonably prolonged the traffic stop to allow deployment of the drug dog.

Dillon deployed his drug dog as he awaited the check on possible outstanding warrants and after another officer had arrived.  The Supreme Court in Illinois v. Caballes allowed police to deploy a drug dog during a traffic stop to sniff for illegal substances without independent reasonable suspicion.  543 U.S. 405.  But "a dog sniff is not fairly characterized as part of the officer's traffic mission" and thus is not a regular way of resolving the traffic-related purpose of the stop.  Rodriguez, 575 U.S. at 356.  "[M]easure[s] aimed at detecting evidence of ordinary criminal wrongdoing" do nothing to resolve the traffic-related purpose of the stop.  Rodriguez, 575 U.S. at 355–57.  Moreover, the Fourth Amendment does not provide police with "bonus time" to pursue unrelated criminal investigations if they expeditiously fulfill their duty to resolve their traffic mission.  Cf. Magallon, 984 F.3d at 1278 ("[O]nce reasonable suspicion or probable cause dissipates, the stop must also cease").  In other words, the reasonableness of a traffic stop is not dependent on the overall duration of a stop in relation to other traffic stops under similar circumstances:

> The reasonableness of a seizure . . . depends on what the police in fact do. . . . How could diligence be gauged other than by noting what the officer actually did and how he did it?  If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission.

Rodriguez, 575 U.S. at 357 (cleaned up and citation omitted).

---

unconstitutional.  See generally Rodriguez, 575 U.S. at 356 (noting that whether a Fourth Amendment intrusion was *de minimis* is not the proper inquiry).

Delaying a routine traffic stop to await a drug dog is generally improper without reasonable suspicion of criminal activity. See United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019) ("A traffic stop is constitutionally limited to the time required to complete its purpose but may be extended due to an officer's reasonable suspicion of criminal activity."). Whether a police officer had reasonable suspicion is an objective inquiry. Terry, 392 U.S. at 21–22 (1968). "When discussing how reviewing courts should make reasonable-suspicion determinations," the Supreme Court has "said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (cleaned up and citations omitted); see also United States v. Jones, 269 F.3d 919, 927 (8th Cir. 2001) ("In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone."). This Court "may consider any added meaning that certain conduct might suggest to experienced officers," but an "officer's reasonable suspicion cannot be, however, just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.'" Jones, 269 F.3d at 927 (quoting Reid v. Georgia, 448 U.S. 438, 441 (1980)).

The facts of this case present a close question of reasonable suspicion to delay the stop for deployment of a drug dog. T2 at 17–20. Guerue did not pull over immediately and turned onto a gravel road and then into a driveway, though the officer had no suspicion that he would fail to stop. Guerue's passenger moved in a way the officer deemed furtive as if concealing something under the passenger seat, but Guerue volunteered that he had a Glock 19 under the passenger seat, and Guerue and his passenger cooperated in allowing the officer to remove the handgun. T1 at 13–17; Ex. 2 at 1–2. Neither Guerue nor his passenger were licensed drivers and Guerue's

19

registration of the vehicle had lapsed.  Yet  Guerue was cooperative, and the officer did not smell drugs or testify to any behavior or observations indicative of drug use.  Guerue's responses seemed normal, though his explanation of why he drove into an aunt's driveway suggested that he anticipated being taken into custody, arousing suspicion from the officer as to what was going on. Guerue denied having any drugs in the vehicle but refused to consent to a search of his vehicle.

Though these facts present a close call on reasonable suspicion to deploy a drug dog, controlling Eighth Circuit precedent establishes that this drug dog use was not violative of the Fourth Amendment.  In United States v. Gunnell, 775 F.3d 1079 (8th Cir. 2015), the Eighth Circuit addressed whether a traffic stop had been unreasonably prolonged to allow another officer with a drug dog to arrive.  It had taken "five minutes or less" for the canine unit to arrive. Id. at 1084.  In Gunnell, the police had information, unlike with Guerue, that the defendant in Gunnell was involved in drug trafficking.  Id. at 1081.  However, that information of drug trafficking fact did not factor into the Eighth Circuit's reasoning as to why the drug dog sniff was permissible.  Rather, the Eighth Circuit in Gunnell permitted the drug dog sniff because the "drug dog arrived while the officers were still conducting the traffic stop."  Id. at 1084.  Important to Guerue's situation, the Eighth Circuit reasoned that "the time it took for [the canine officer and dog] to arrive at the scene did not exceed the time it took the other officers to run Gunnell's information through the computer in the course of the traffic stop."  Id.  Thus, the Eighth Circuit reasoned, "the officers were still completing the purpose of the stop when the canine officer and dog arrived and conducted the dog sniff. Id. (cleaned up and citation omitted); see United States v. Braddy, 11 F.4th 1298, 1311–12 (11th Cir. 2021) (finding that use of canine to sniff exterior of vehicle during lawful traffic stop does not violate Fourth Amendment if canine unit arrives while routine records check and preparation of traffic citation is ongoing).  Dillon was still waiting to hear back from dispatch on

the warrant and NCIC checks when the drug dog search began and when the drug dog alerted.  See Rodriguez, 575 U.S. at 355 (stating that officers "may conduct certain unrelated checks," but not "in a way that prolongs the stop").  What Dillon did in short is permissible under Gunnell.

Guerue also moves to suppress statements he made when later interviewed, arguing that suppression of evidence found after the drug dog sniff renders his later statements subject to suppression.  There is little in the record regarding the interview conducted by Agent Antman on February 27, 2021.  Guerue does not appear to contest that he made these statements voluntarily, after waiving his Miranda rights.  Because this Court has concluded that Guerue's Fourth Amendment rights were not violated, suppression of his subsequent statements is not justified.

### III.    Conclusion

For the reasons explained in this Opinion and Order, it is

ORDERED that Guerue's motion to suppress, Doc. 27, is denied.  It is further

ORDERED that the Report and Recommendation, Doc. 52, is adopted to the extent consistent with this decision and that Guerue's objections, Doc. 53, to the Report and Recommendation are denied to the extent consistent with this decision.

DATED this 20th day of December, 2022.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE